Welcome to the Ninth Circuit. We have just one case for argument this afternoon. Centerprise International v. Micron Technology. You may proceed. Also, I notice we have counsel. Just so you know, there is a clock there, and if you'll watch your time, I'm sure you want to save some time for rebuttal. Yes, thank you. I'll plan on preserving five minutes. All right. May it please the Court, James Shaw of Sheppard, Finkelman, Miller & Shaw, on behalf of the appellant, Centerprise International Ltd. Present with me today are my partner, Scott Sheppard, and Mr. Paul Klinger, who is Centerprise's general counsel who traveled from the United Kingdom to be with us today. Welcome to the Ninth Circuit. Thanks for the nice weather. The district court erred below by dismissing Centerprise's claim asserted under the Foreign Trade Antitrust Improvement Act, and further erred by refusing to permit Centerprise leave to amend its complaint. As the D.C. district court noted in IMPA Grant 2, the Act's legislative history makes it clear that the domestic injury exception does not exclude all persons injured abroad from recovering under U.S. antitrust laws. Before you get too deep into your argument, could you help at least me understand the market structure here so we know what it is that we're talking about? Could you just describe how the pricing market works? Because I can't tell from your complaint whether you're a direct purchaser, you're an indirect purchaser, you're both. Where the pricing mechanism kicks in. It would be helpful just to get an amplification of what you've alleged in the complaint. Certainly, Your Honor. The commodity at issue is DRAM. I understand that. We know there's a worldwide market. It was purchased directly by Centerprise, solely abroad. Yes. No purchases in the U.S. market. Okay. So the purchase, when you say it's purchased abroad, do you buy through the defendant's subsidiaries? Do you buy it wholesale? No. Directly through, in most instances, directly through the defendants themselves or their subsidiaries. Okay. But operating abroad? Correct. None of the purchases by Centerprise were made in the United States. Right. All the purchases were abroad. Right. The district court, in order to state a claim under the FTAIA, one must only assert that the anti-competitive conduct has a direct, substantial, and reasonably foreseeable effect on U.S. commerce. Okay. Can I just say, and I don't want to speak for the panel, but that actually seems like an easy hurdle to jump over. And what I'm most concerned about is, one, the standard we would use if we follow the other circuits in approximate cause, and if we were to follow that, you know, how it fits into your case, because that to me seems, just to be honest, your most difficult hurdle. Certainly, Your Honor. With respect to the what standard to apply to the gives rise to language, certainly the Act isn't a model of clarity with respect to what standard to apply. Appellant Centerprise acknowledges that the D.C. Circuit Court in Epigram 2 and all courts subsequently that have analyzed this have applied the approximate cause standard, and so for purposes of argument, we'll accept that standard because Centerprise believes that its pleading satisfies that standard. But I recognize that you also argued the other. So we're not asking you to give that up. Thank you. In dismissing the claim below, the district court concluded that the allegations in the complaint by Centerprise were the same as the allegations in the Epigram 2 complaint, which dealt with the vitamin cartel. The allegations in Epigram 2 were that in order to sustain super competitive prices abroad, the defendants had to maintain super competitive prices in the United States. In the face of those allegations, the D.C. Circuit Court and, frankly, numerous other courts that have decided similarly pledged complaints under the Act have concluded that that is too independent to give rise to a finding approximate cause, that it may satisfy the but-for standard, but not approximate cause. Where this complaint differs and where the district court mischaracterized this complaint is that the allegations regarding the DRAM market specifically are separate and markedly distinct from the allegations that we were linked to in connection with Epigram 2. Here the allegation is that the defendants purposefully conspired to set the DRAM price in the U.S. market, that by design and having done so, that they implemented business and sales practices and channels that were intended to and did ensure that the worldwide price of DRAM had to be tracked in U.S. dollars and had to be traded in U.S. dollars tied back to the U.S. price. As such, the setting of the DRAM price in the U.S. market was the direct source of the foreign price. They were inextricably intertwined. Okay. Let me ask you about that, because it seems to me there's kind of two allegations bundled there. One is setting a price in the U.S. market that you view as direct causation of the price in the foreign market. A second, and either subsidiary or independent, is benchmarking that to U.S. dollars. And why isn't that a currency issue as opposed to a market issue? Because whether it's in U.S. dollars or some other currency, I mean, every international contract is in some currency. That doesn't necessarily affect what the price is. Well, that's true. However, the allegation here is that with respect to a proffer that we would make with respect to any amendment is that, for example, Centerprise purchased well in excess of 90 percent of the DRAM abroad in U.S. dollars, which is entirely consistent with our notion that through the sales and distribution channels that the defendants intended to ensure that not by setting the price in the U.S. that they could later sustain or maintain similar prices abroad, again, which is more the IMPOGRAM allegations, but here that by directing the conduct in the U.S. market and setting up the sales and distribution channels that they did and requiring that it be tracked in U.S. dollars, that there would be an immediacy, a directness to the fact that they need a little more help because, you know, with basically simultaneous transactions in an international market, how would it differ if, in fact, they had the market in the U.S., everything you've said, and, you know, they were at X dollars, and then by virtue of an electronic calculation, the price offered in Europe or elsewhere were blank or euros. Let's put it in euros, were blank euros. What would be the difference between that and your transaction? Well, I think that for purposes of proximate cause, if, as here, it was still alleged that the purpose of directing the conduct to the U.S. was to have one location that served as essentially an emanating point for the global unified price, that regardless of whether or not it was ultimately the product was ultimately purchased in pounds or euros, that it still would give rise to the proximate cause. I think what the allegations with respect to requiring the tracking in U.S. dollars and tying to the U.S. price do is they further confirm or further articulate what the intention of the defendants was with respect to utilizing the U.S. market as the focal point for setting the global price for the product. So what would you – what's the alternative that they should be doing to price fairly in the foreign market? Well, in the first instance, the anti-competitive conduct was a decision to reach an agreed-upon price that was transmitted through the U.S. market. In terms of what they should be doing in the foreign markets, it goes back to not engaging in the – That almost is a but-for. It's the locus of the purchase point that's getting a little confusing here. They agree – the three companies get together, fix the price. To all of their domestic U.S. customers, those customers, anything sold in the United States will be bought at the fixed price. What you're saying is what they then do is that when you, as a foreign buyer, want to buy from them through their foreign offices, they are at that fixed price quoted in the same dollars. That's what you're saying, right? Correct. They could quote it at the converted price to euros. It would still be the same thing. It's the fixed price established by the three conspiring companies. Correct? Correct. Butchers, if they had the domestic conspiracy, but they decided, all we want to do is we want to control sales within the United States, we're willing to let the price be whatever it is overseas, you could then compete overseas amongst the three offices. Is that what you're saying? Well, that's certainly true. It wouldn't make any difference if there were a pricing conspiracy in the United States, limited to the United States, as long as you could buy competitively. Now, presumably there will be arbitrage and everything. That will probably foul it all up. Well, certainly under Your Honor's scenario, the U.S. effect of any conduct would not, from our standpoint, have given rise to foreign harm. So the foreign harm, though, is the export of the U.S. price in effect. Well, the foreign harm is the effect of the conduct in the U.S. The effect is the increase in the U.S. price. That increase, again, as a result of the sales and distribution channels became the immediate conduit by which a global unified price was set in the DRAM market. So, again, to distinguish it and to be clear. What happens to the price? You say you get up in the morning and you call the Taiwan office and do all that kind of thing. What is, if they're quoting, if you call them up in Philadelphia and you ask for a quote today and it's $3 a bit or whatever it is, but instead of calling them and buying it in Philadelphia, you call them and buy it in Bombay and they quote you it's $3 a bit over there. Is that it? Well, correct. As a result of the conduct that is alleged, there was essentially a one-for-one correlation between the price in the U.S. So they're just pricing worldwide based on See, that's where I'm having a little trouble because when you talk about a if you have a direct correlation in U.S. price or even I wouldn't even call it a direct correlation under your theory, I would say a parallel or a complete Venn diagram, isn't that the epigram two case in effect? Maybe you could distinguish that. The distinction is that in connection with the vitamin cartel, if you have global marketplaces, global markets for vitamins and you have various manufacturers of the vitamins in their respective markets, they've reached agreement, but they're maintaining the prices in their own markets. There's an independency to that. Although Was that a resale price maintenance claim in the vitamin case? There was. It was, yes. Okay. But there is an independency to just maintaining the prices independently in various marketplaces as opposed to when the cartel has come together and made a specific decision that we're going to direct the price to one location, the United States, and utilizing that location, that's how we're going to set a unified global price. I acknowledge that it is somewhat of a subtle distinction, but it is an important distinction. The difference is if Company A conspired with Company B, which was abroad, to fix prices and there was enough effect that that could be a U.S. antitrust violation against Company A, that's different than if A and B conspired within the United States to use the same price, but they did it within the U.S.? I mean, is it a geographic thing or a price thing? Well, what gives rise to the foreign harm here under the Act is that the decision was made by the defendants to direct the conduct initially with respect to how the price was set into one location, and that was the U.S. market. So then it is a geographic. That's what distinguishes this from the – and that is – that's what distinguishes this from AMPAGRAM, because there there was no specific allegation other than that they had to keep prices in the U.S. elevated in order to sustain their claims abroad. Here the allegation is that they directed and set the price in the U.S. so that they could then set a uniform global – what really the difference in the allegation here is, is that by doing it in the fashion that they did, they've circumvented or obviated the need for this kind of independent market-sustaining activity because they've all directed it at one place. It sounds like all you're really alleging, in effect, is that the three companies in my hypothetical, the United States has simply, through their overseas offices, just transported the same conspiracy overseas. They're selling the United States at a fixed price. They're selling overseas through their subsidiaries or whatever offices at a fixed price. Could you sue them in the United Kingdom, for example, under EU antitrust laws or whatever, where your remedies would be against them for activities, price-fixing activities within the U.K.? For activities, for price-fixing activities that occurred in the U.K.? Yeah. I think that you could, but I think that here, where the conduct was directed – The whole point of this, as I understand it, this foreign antitrust and comedy concept is that the United States, the Sherman Act is to deal with works and effects in the United States that, if in the U.K. they have a different regime and they're buyers, how they protect their consumers or buyers over there, if they've elected to say, you know, we don't mind if companies get together because in this high-tech industry, for example, we want to allow, basically, joint efforts and let them get the benefits of working together. But you're saying, well, it's illegal in the United States. Britain wouldn't let us sue them for this activity, but the United States would, and we're buying over here, and therefore, because the price is set in the United States and translates over the Atlantic, we get to take advantage of the Sherman Act, even if we couldn't sue them under the U.K. equivalent. Well, I think the important point on comedy here is that the domestic injury exception to the FTAIA in the underlying legislative history makes clear that where the U.S. effect is, gives rise to, is inextricably bound to the foreign harm. Congress has spoken in carving that out, that it believes that there is a legitimate and reasoned basis for permitting that suit under U.S. law. And in fact you could have parallel, I mean, EU is, of course, pretty active these days in the antitrust field and has, you know, come down pretty hard on a lot of U.S. companies. So under your theory, I mean, you could have the potential for a suit in the EU, although the remedies are different. But your view is that if the, if there's an exception, there must be something that fits the exception, and your case fits the exception. Certainly. And with respect to the U.S. and comedy issues, the U.S. certainly has a legitimate and material interest in policing conduct that is directed within the United States that causes harm not only in the United States, but that has approximate nexus to harm that's caused abroad. Could you, would you, we'll give you a little extra time. Kagan. One of the things that we need to address also is if we were to determine that as pled, there's no claim, it's not clear to me what additional you had offered to plead as part of a motion to amend or potential amendment. Sure. With respect to a potential amendment, I think that Senate Price would be able to with respect to how it made those purchases, as I said, almost exclusively in U.S. dollars, regardless of whether or not the purchases were made from Taiwan or in Europe or elsewhere. And to speak directly to what we've characterized in the initial pleading is the sales and distribution practices and channels that were set in place purposefully and intentionally by the defendants so that they could utilize the U.S. market as the sole means of setting the global price. Did you offer an amended pleading? We did not. Okay. So there's not something I'm looking at that says all of that other than the briefing? That's correct. Okay. Thank you. Could I ask you about standing? I know the district court didn't reach it, but it's the issue is there. And what standing do you have? Well, I've responded on several fronts. First, if one accepted the interpretation of the defendants with respect to standing, it would essentially render the FTAIA a nullity because, as the district court in the Microsoft opinion out of the District of Maryland in 2001 said, the AGC factors really don't contemplate the existence of the FTAIA. I would also point out that the AGC factors were set down by the Supreme Court to address what was viewed as being remote injury, seeking to recover for remote injury, even though it may technically have fallen under the antitrust laws. I would point out that by application of the proximate cost standard to the gives rise to language, that necessarily requires a proximate nexus between the U.S. domestic effect and the foreign claim. So, therefore, any issue of remoteness or concern about remoteness, which is what the AGC factors really speak to, is addressed. That's why the Supreme Court in Holmes alluded back to the antitrust laws and proximate cause, I believe. Correct. And why Justice Judge Hamilton in a recent decision in Sun Microsystems, which also deals with the DRAM issue, basically concluded that if you state a claim under the FTAIA, that that essentially satisfies that first AGC standard regarding the nature of the injury. Let me just ask if, as a matter of public record, is there any parallel or other litigation pending in any other jurisdiction, any other sovereignty or jurisdiction? Not that we're aware of with respect to this. All right.  Thank you. Good afternoon, Your Honors. My name is Michael Blechman from Kaye-Scholer. I'm arguing on behalf of all of the defendants, and I am accompanied today by my colleague, Joshua Istanbul, from our Los Angeles office. May it please the Court. Subject to guidance from Your Honors, I intend to address three things. First, the reasons why we believe this Court should follow the rule in Epigram II as adopted by the other courts. I think that's been well briefed. Okay. We're accepting proximate cause for purposes of argument without waiving the but-for issue, but if you can tell from at least most of our questions, we'd like to understand the market a little better. Okay. Then I will address two points. One is why the allegations of this kind of complaint don't satisfy the proximate cause test, and second, why the Court properly denied leave to amend. The — as Mr. Schott argued or explained in his argument, the — what the — he sees as the allegations of this complaint sounds to me like exactly what the plaintiffs in Epigram II were alleging, and in footnote 5, as we mentioned in our brief, in footnote 5 of the Epigram II decision, the Court specifically mentions that that conspiracy was to set a single global price. So the price in the United States at that — in that case was allegedly the same price as in Europe or the same price as in Ecuador, where these other plaintiffs came from. So in terms of comparison or distinguishing with Epigram II, the allegations are essentially the same. Secondly, when you look at the allegations specifically in paragraph 75 about how the market works and how the — how the plaintiff went about deciding what to pay for DRAM, what that alleges is, in effect, a international market where they begin, because those are the first prices to come out, by looking at what the prices are in Asia. Then they track, i.e., they look and see what's being asked and — and offered in the United States. And then at the end of the day, the market in the U.K. comes alive and they decide what they're going to pay for DRAM based upon the experience in the other markets. All that indicates is that you have a interrelated global market, which is exactly what you had in Epigram II, exactly what you had in the MSG case, exactly what you've had in Latina Quimica, in all of the cases that you've had. Right. So that leads me to one question. I mean, I know Congress obviously concerned about extraterritoriality, but they did carve out an exception where if you have, you know, the effects of the foreign trade that give rise to a claim under Section 1, then you have this exception. So let me ask you first in the abstract, what could — what could fall in there? You don't have to answer necessarily within the context of the DRAM matter, but what would be the essence of an allegation that could meet this proximate cause? Okay. Two kinds of allegations that — that have arisen in the cases and been argued. One is where a foreign plaintiff, a foreign purchaser, actually comes into the United States and buys some good or service entirely in United States commerce, not as an export because the FTAIA was meant to exclude exports, but in a transaction that is consummated and complete in United States commerce. So you don't need the exception for that. Why doesn't that fall right under the normal antitrust law? It does, because that would not be in foreign commerce. Exactly. Yes. I mean, it would be in the sense that you may have foreign transactions, but it would be a domestic purchase, in effect, if you come into the U.S. So you don't — that doesn't answer my question, because you don't need this exception to get you that claim. Okay. Well, then, where it's clearly in foreign commerce, the exceptions, the cases that are the most cited for ones that would be subject to United States — to the Sherman Act and United States antitrust law are ones like the Caribbean broadcasting case, where the anticompetitive effect in the United States was the monopolization of the market for the sale of advertising in the eastern Caribbean. It's a market that included U.S. possessions. The purchasers in that market, the purchasers of the advertising, were, to a substantial extent, in the United States. So the anticompetitive effect in the United States was that those purchasers were deprived of a choice and paid higher prices because the monopolist defendant excluded competition by misleading the buyers as to what it could do and what its competition could do. That exclusion, that monopolization, directly had the immediate simultaneous effect of excluding the plaintiff because he was the one excluded. So the American buyers were hurt by the exclusion because they lost their choice and paid higher prices. And the foreign competitor was hurt by the same exclusion, the same anticompetitive effect in the United States, immediately. That's the example that the — that is — was most cited in Empergram 2 and other cases which have dealt with this by the Department of Justice when they've argued this. Other case examples which are similar are the Industria Siciliana case, which was an old case involving — That's before the Act was passed. It was before the Act was passed. But it was cited by — after the Act by courts looking for the kind of case that would be admissible even, you know, after Empergram 2. Those are the kinds of cases. There aren't — haven't been a lot that have — that have been, you know, found that come within the exception. And there have been some more difficult cases where it's been less clear whether it was United States commerce or export commerce. But basically, those are the kinds of immediate effect cases that have arisen. Well, you know, I suppose that the Centerprise would say that it's not a lot different than the Caribbean Basin advertising case. Maybe there's not a misleading aspect to it. But the U.S. cartel circumstance, in effect, bled into the foreign injury because not just a but for, but it was that market, it was that pricing that led to their exclusion. They would say it's that market that led to the excess pricing in Europe. Why doesn't that hold water? Okay. The difference is that in Caribbean broadcasting, it was the exclusion, the anticompetitive effect in the United States, the monopolization, that without going through any intermediary steps, immediately harmed the plaintiff. In this case, like in all of the other global conspiracy cases, you have an alleged anticompetitive effect in the United States, higher prices in the United States, which in turn caused allegedly an anticompetitive effect in the United Kingdom. That in turn, the word in turn, the because, is another step. And if it's another step, it's not proximate and it's not direct. It's indirect. This is another step. Do you disagree with his characterization of how the sales transaction occurs, does occur? It sounds, you say in turn, but the way counsel is characterizing it, they agree on the price, set the price in the United States, that is the same price that gets quoted whether in dollars overseas. So, that is the benchmark price. And wherever you go worldwide, that will be the price unless some intermediary, I suppose, wants to somehow arbitrage. I don't know how they arbitrage it. But, you know, you say Epigram had the same kind of worldwide pricing. It's a little spare in its description. So, I'd like to understand how the description of this market, if the defendants are selling directly, excuse me, yeah, the defendants are selling directly to the foreign purchasers based on the U.S. price. They're just simply geographically transferring the quote to foreign soil, but the price quoted on foreign soil is fixed in the United States. Why, what's the next step? What is, it seems to me that that is fairly proximate. What the complaint says, and then we'll come back to the characterization of the complaint, is that the sellers and the ones that are mentioned are all in Korea or Taiwan, sell to the U.K. and that the U.S. price influences that price that's charged and paid because it's a benchmark, because the price is tracked, because that's something that people look to. But even if it was beyond that and there was a conspiracy, which I don't think is alleged, that the U.S. price would automatically be the foreign price, which is the situation that you did have in Empergram, then you still have a two-step process from the United States affecting, influencing the U.K. price. I think the way- What are the two steps? Pardon? What are the two steps? First, you have the United States price that's set, and then you have an agreement that we will then charge that price also in the U.K. I think it would, if I may, just step back to the rationale for Empergram, because I think it affects the answer to your question, Your Honor. The rationale, what the Supreme Court said, is why should we oust U.K. law here? Why should we impose American law on a situation where a British company is hurt in the U.K. by an international conspiracy? If you have an international conspiracy that has an effect in the U.K. and maybe even simultaneously in the U.S., which is not alleged here. Here it seems to be a rolling effect. But even if it were simultaneous, which is what I understand was the situation in Empergram, too, with a global price, there's no reason why we should oust U.K. law. Ousting U.K. law is only justifiable, according to the Supreme Court, where you're remedying a domestic U.S. antitrust injury. That was what the court said. And you're only remedying a domestic U.S. industry when the anticompetitive effect in the U.S., the higher price in the U.S. is what causes the injury or other anticompetitive effect in the U.S. is what directly causes the plaintiff's injury. Where you have a global conspiracy and the U.S. is a benchmark, it's pegged to it, it influences it, it substantially influences all the words that are used, then there's no real good reason why the U.K., which made it clear in Empergram and in Zemeckis' brief, it wants its own law to apply, why we should oust U.K. law. Because that is the question. Ginsburg. One of the difficulties when you go down the comedy route is that the comedy route, of course, causes us to put certain brakes on the U.S. courts. But we now have Congress legislating within its powers saying, but if you have a proximate cause, it's okay. I mean, we don't say there's proximate cause, you know, then we might decide for comedy purposes not to administer it. But the real issue here is if the U.S. price is the baseline price and that is an antitrust violation, is it direct enough, is it the direct cause of their problem? I mean, that's really the bottom line. And there are two ways of analyzing or looking at that situation, Your Honor, that question. One is with the words proximate cause, what do they mean? And as I understand it, it means the next, it means the immediate step with no intervening steps. So if it's a baseline, if it's an initia, if it's an influence, that, by definition, has more than one step in it. But the other way, and what the Supreme Court laid down as the laws, I understand it, is that you have to apply this test gives rise to, which has been interpreted as proximate cause, in a way that through the lens, if you will, of prescriptive comedy, which means starting with the principle, which was what the Supreme Court did, a prescriptive comedy, which is where proximate cause came from, under what circumstances does calling something proximate cause or not calling it proximate cause fit in with that basic policy of saying this is a case where it makes sense that U.S. law should oust British law because our interest, the interest of the American economy and the anti-competitive effect here is greater than it was in Britain. Because the comment on your, that's a very good exposition. Proximate cause is just elastic. It depends where you're going to put the policy. And the policy says, well, we're not going to help out the British. They've got to order their own. So we draw the line there. There's no, there's no content to proximate cause. It's just whatever the Court wants to draw it. And that's, you put your finger on it. I think that interpreting it in light of a policy doesn't mean there's no substance to it. It means that there is, that proximate cause could, in different areas of the law, the words could be applied differently. Well, all the time there's causation in fact, but we say, well, we won't go very far because it will hurt some other interests. And the other, the other. We don't want to go causation in fact because the chain is infinite. The other, the other source of law that the courts point to, of course, Your Honor, is the antitrust law of, of standing and associated general contractors, that it's, it's basic to antitrust law that we don't follow things through to their, their, their last ripple, that it has to be immediate and, and, and direct. Just I, I, one point on the, on the motion to, to amend. Yes, please. We, in this case, we know what the proposed amendment was because the, the plaintiff indicated below that it wanted, it introduced, with its brief below, some data as to the correlation of British, of foreign, worldwide prices and U.S. prices, and they said we want to amend to, to, to, to implement those. They, in the oral argument, I'm looking at page 27 of the record, the Court asked, you know, I'm a little unclear, what is the additional information about the relationship of U.S. prices and foreign prices? You know, what, what, what is the, what does that add? And Mr. Shah said, to clarify, to the extent that the Court believed that there was some lack of clarity with respect to this correlation, we certainly don't believe an amendment is needed in the first instance because we believe that that which is pled is sufficient to satisfy the standards. It was clear that all what the amendment would do would give more facts, more, more detail on the correlation. And once the Court established that a mere correlation between U.S. and worldwide prices, which is the same as what you had in Empergrande and every other case, was not enough as a matter of law to establish, meet this Proxima Taurus test, then, then it was clear it would be a futility. In the, a footnote in the reply brief on appeal, the, and he hasn't argued, Mr. Shah hasn't argued it here, but he raised the point about his, his right to amend as of, as of right. And just quickly, besides the fact that that can't be raised because you can't raise a new argument in, in a, in a reply brief on appeal, there, in this case, their judgment has been entered. It's at page 52 of the record. Final judgment has been entered. And the right to amend as of right under 15a has an endpoint, and that endpoint is at the point where, where final judgment is entered. In addition, there's a number of cases in this circuit which have found that you don't have to allow even an amendment as of right when it would be a futility. Anything else, Your Honors? Thank you. Thank you. Thank you for the ---- We'll give, we'll give you another minute. I guess you're at zero, but that's, don't. Thank you. Just several very quick points. First, in a recent decision out of the Eastern District of Pennsylvania, Judge Shapiro in In re Graphic Electrodes, Graphite Electrodes, noted in dismissing a claim under the FTAIA that there was an absence in that complaint specifically that there was no allegation that prices for graphite electrodes in the foreign market were set by prices or practices in the domestic market. And I would just state that that is precisely the type of allegation that is in the center price complaint and that Justice Shapiro was recognizing, in her opinion, would take a case potentially from the but-for into the proximate cause under the proposed rise to language. Second, with respect to the comedy argument, defendants continue to raise comedy at every turn, but whenever they raise it, it's clear that they would always use that as a shield to any foreign purchaser asserting a claim under the FTAIA. And that's not only what the face of the legislation sets forth, but also what the underlying legislative history states. And the reality is the United States has very strong interest in policing and that causes damage in the U.S. and that proximately causes damage abroad. Thank you. If you let me ask you this question, because looking at what you alleged in paragraph 75, you say that the United States prices were the source of and substantially affected the worldwide dram prices. If given leave to amend, would you allege that the United States prices were, in effect, the worldwide dram prices? We would we would, if given leave to amend, we would allege that they were, in fact, the direct source of the price internationally. But not the actual price. In other words, they contribute to the price. We could allege that the correlation was essentially one-to-one, the actual price, yes. Okay. Thank you. Thank you. The case just argued, Centerprise v. Micron, is submitted. I would like to thank both counsel for your arguments today, also for the briefing, very complete briefing, and I guess we're now the Third Circuit to take this up directly.  Thank you. All rise. Thank you.  Thank you. Thank you. I'm glad we brought our notebooks. Have you ever actually utilized one? It's the one time you don't bring it. Turn to page 752, please. Take care now. Thank you.
judges: Noonan, McKeown, Fisher